### UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF KENTUCKY
### LOUISVILLE DIVISION

| | |
|---|---|
| **HALEY BEASLEY,** on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>**YUM! BRANDS, INC.,**<br><br>Defendant. | **CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>3:23CV-206-GNS |

Plaintiff HALEY BEASLEY ("Plaintiff") brings this Class Action Complaint against YUM! BRANDS, INC. ("YUM!" and/or "Defendant"), as an individual and on behalf of all others similarly situated, and alleges, upon personal knowledge as to her own actions and her counsels' investigation, and upon information and belief as to all other matters, as follows:

### I. INTRODUCTION

1.    Plaintiff brings this class action against Defendant YUM!, an American fast food corporation, to seek damages for herself and other similarly situated current, former, and prospective employees, or any other person(s) impacted in the data breach at issue ("Class Members") who she seeks to represent, as well as other equitable relief, including, without limitation, injunctive relief designed to protect the very sensitive information of Plaintiff and other Class Members. This action arises from Defendant's failure to properly secure and safeguard personal identifiable information, including without limitation, unencrypted and unredacted names and Social Security numbers (collectively, "personal identifiable information," "PII," or "Private Information").

2.    Plaintiff alleges Defendant failed to provide timely, accurate and adequate notice to Plaintiff and Class Members who were or are applicants or employees of YUM! Current and

former job applicants and employees' knowledge about what personal identifiable information YUM! lost, as well as precisely what types of information was unencrypted and in the possession of unknown third parties, was unreasonably delayed by YUM!'s unreasonable notification delay of four months after it first learned of the data breach.

3.      On or about April 6, 2023, YUM! notified state Attorneys General about a widespread data breach involving sensitive PII of at least thousands of individuals.[1] YUM! explained in its required notice letter that it discovered an unauthorized third-party gained access to certain of YUM!'s systems. YUM! discovered that files on its network were accessed and acquired by the unknown actor (the "Data Breach").

4.      Although the unauthorized access began on January 13, 2023, YUM! chose not to notify affected individuals or, upon information and belief, anyone of its data breach when it became aware of the situation, instead choosing to address the incident in-house by implementing other safeguards to some aspects of its computer security.

5.      On April 14, 2023, YUM! notified certain Class Members that their PII had been impacted and that its "review determined that the exposed filed contained some of [Plaintiff's and Class Members'] personal information" was included in the Data Breach.[2]

6.      According to Defendant, YUM! conducted "a detailed review, with the assistance of outside specialists, to identify whether personal information belonging to individuals may have been present in files that were affected during the incident."[3] Through the investigation, YUM! learned that certain files containing personal information were accessed or acquired without

---

[1]  Office of the Maine Attorney General, *Data Breach Notifications*, available at: https://apps.web.maine.gov/online/aeviewer/ME/40/b85bfcfb-4ff7-419e-8dd2-95e8f41a5ad1.shtml (last accessed April 23, 2023).

[2] *Id.*

[3] *Id.*

authorization.[4]

7.      YUM! alleges it "has taken steps in response to this incident to prevent similar incidents from occurring in the future."[5]

8.      Plaintiff and the Class Members in this action were, upon information and belief, current and former employees and current and former job applicants of YUM!. Upon information and belief, the first that Plaintiff and the Class Members learned of the Data Breach was when they received by U.S. Mail Notice of Data Breach letters in April 2023.

9.      In its notice letters, sent to Plaintiff and Class Members, YUM! failed to explain why it took the company nearly three months to alert Class Members that their sensitive PII had been exposed. As a result of this delayed response, Plaintiff and Class Members were unaware that their PII had been compromised, and that they were, and continue to be, at significant and present risk to identity theft and various other forms of personal, social, and financial harm.

10.     Plaintiff's and Class Members' unencrypted, unredacted PII was compromised due to YUM!'s negligent and/or careless acts and omissions, and due to the utter failure to protect Class Members' sensitive data. Hackers obtained their PII because of its value in exploiting and stealing the identities of Plaintiff and similarly situated Class Members. The risks to these persons will remain for their respective lifetimes.

11.     Plaintiff brings this action on behalf of all persons whose PII was compromised as a result of YUM!'s failure to: (i) adequately protect Plaintiff and Class Member PII; (ii) warn Plaintiff and Class Members of its inadequate information security practices; and (iii) effectively monitor YUM!'s network for security vulnerabilities and incidents. YUM!'s conduct amounts to negligence and violates federal and state statutes.

_____

[4] *Id.*
[5] *Id.*

12.     Plaintiff and Class Members have suffered injury as a result of YUM!'s conduct. These injuries include: (i) lost or diminished value of PII; (ii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (iii) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time, (iv) the loss of time needed to take appropriate measures to avoid unauthorized and fraudulent charges; change their usernames and passwords on their accounts; investigate, correct and resolve unauthorized debits; deal with spam messages and e-mails received subsequent to the Data Breach, (v) charges and fees associated with fraudulent charges on their accounts, and (vi) the present, continued and certainly an increased risk to their PII, which remains in YUM!'s possession and is subject to further unauthorized disclosures so long as YUM! fails to undertake appropriate and adequate measures to protect the PII. These risks will remain for the lifetimes of Plaintiff and Class Members.

13.     YUM! disregarded the rights of Plaintiff and Class Members by intentionally, willfully, recklessly, or at the very least negligently failing to take and implement adequate and reasonable measures to ensure that PII was safeguarded, failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow applicable, required, and appropriate protocols, policies, and procedures regarding the encryption of data, even for internal use. As the result, the PII of Plaintiff and Class Members was compromised through disclosure to an unknown and unauthorized third party. Plaintiff and Class Members have a continuing interest in ensuring that their information is and remains safe, and they should be entitled to injunctive and other equitable relief.

## II. PARTIES

14.    Plaintiff Haley Beasley is, and at all times relevant has been, a resident and citizen of Kentucky, where she intends to remain. Plaintiff received a "Notice of Security Breach" letter, dated April 14, 2023, on or about that date. The letter notified Plaintiff that on or around January 13, 2023, YUM! identified unusual activity on its network and that there was "unauthorized access to certain of our systems." The type of data at issue included full names and Social Security numbers. The letter further advised that Plaintiff that she could participate in credit monitoring services detecting suspicious activity.

15.    Defendant YUM! is Kentucky corporation headquartered in and with a principal office location of 1441 Gardiner Lane, Louisville, Kentucky 40213. YUM!'s "subsidiaries franchise or operate over 55,000 restaurants in more than 155 countries and territories under the company's concepts – KFC, Taco Bell, Pizza Hut, and The Habit Burger Grill."[6]

16.    All of Plaintiff's claims stated herein are asserted against YUM! and any of its owners, franchises, predecessors, successors, subsidiaries, agents and/or assigns.

## III. JURISDICTION AND VENUE

17.    This Court has subject matter and diversity jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount of controversy exceeds the sum or value of $5 million, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one Class Member is a citizen of a state different from Defendant to establish minimal diversity.

18.    The Western District of Kentucky has personal jurisdiction over Defendant named in this action because Defendant and/or its parents or affiliates are headquartered in this District

---

[6] https://www.yum.com/wps/portal/yumbrands/Yumbrands/company (Last accessed on April 23, 2023).

and Defendant conducts substantial business in Kentucky and this District through its headquarters, offices, parents, and affiliates. Plaintiff is a citizen and resident of the State of Indiana.

19.     Venue is proper in this District under 28 U.S.C. §1391(b) because Defendant and/or its parents or affiliates are headquartered in this District and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## IV. FACTUAL ALLEGATIONS

### *Background*

20.     Defendant is one of the world's largest restaurant companies, that has "more than 55,000 restaurants in over 155 countries and territories." Its restaurant brands include KFC, Taco Bell, and Pizza Hut.[7]

21.     Plaintiff and Class Members were applicants and/or employees of YUM!. Their PII was required to be provided, and was in fact provided, to Defendant in conjunction with employment applications or during the course of their employment with Defendant. Plaintiff's and Class Members' PII were required to fill out various forms, including without limitation employment paperwork and applications, tax documents, various authorizations, other form documents associated with the gaining employment.

22.     Plaintiff and Class Members relied on the sophistication of Defendant and its network to keep their PII confidential and securely maintained, to use this information for business and/or employment purposes only, and to make only authorized disclosures of this information. Plaintiff and Class Members demand security to safeguard their PII.

---

[7] *Id.*

23.     Defendant required the submission of and voluntarily accepted the PII as part of its business and had a duty to adopt reasonable measures to protect the PII of Plaintiff and Class Members from involuntary disclosure to third parties. YUM! has a legal duty to keep PII safe and confidential.

24.     The information held by Defendant in its computer systems and networks included the PII of Plaintiff and Class Members.

25.     Defendant derived a substantial economic benefit from collecting Plaintiff's and Class Members' PII.

26.     By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' PII, YUM! assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff's and Class Members' PII from disclosure.

27.     Plaintiff and the Class Members have taken reasonable steps to maintain the confidentiality of their PII.

28.     In its Notice of Data Breach letter to victims of the Data Breach, YUM! claims that it is dedicated to protecting personal information in its possession.[8]

29.     Plaintiff and the Class Members, as current or former employees and/or job applicants of YUM!, reasonably relied (directly or indirectly) on this sophisticated company to keep their sensitive PII confidential; to maintain its system security; to use this information for business purposes only; and to make only authorized disclosures of their PII. Employees, in general, demand security to safeguard their PII, especially when sensitive PII is involved.

30.     YUM! had a duty to adopt reasonable measures to protect Plaintiff's and Class

---

[8]  Office of the Maine Attorney General, *Data Breach Notifications*, available at: https://apps.web.maine.gov/online/aeviewer/ME/40/b85bfcfb-4ff7-419e-8dd2-95e8f41a5ad1.shtml (last accessed April 23, 2023).

Members' PII from involuntary disclosure to third parties.

### *The Data Breach*

31.    "YUM! experienced a cybersecurity incident involving unauthorized access to certain of [its] systems on or around January 13, 2023."[9]

32.    To date, YUM! has not revealed when the unauthorized actor first gained access to a portion of Defendant's network, nor has it revealed the mechanism by which the unauthorized actor first gained access to Defendant's network.

33.    After YUM! initially discovery the unauthorized access to its systems, YUM! commissioned computer forensic specialists to conduct an investigation to determine the nature and scope of the event.

34.    The victims of this Data Breach, including Plaintiff and Class Members, were not sent notice of this Data Breach until approximately three months after YUM! first knew about this Data Breach.

35.    Defendant's investigation was inconclusive whether or not the accessed data has been or will be misused by the hackers. However, upon information and belief, YUM! has no methods, policies, or procedures in place that would afford its employees and applicants (like Plaintiff and Class Members) any mechanism or opportunity to report misuse of the data back to YUM!, and the investigation commissioned by YUM! did not survey individuals whose data was breached for evidence of misuse.

36.    The threat actor, and likely acquired, files on the server containing PII, including names and Social Security numbers.

37.    On or around April 6, 2023, Defendant disclosed the Data Breach to the Maine

---

[9] *Id.*

Attorney General's Office.[10]

38.     YUM! first notified its impacted employees and applicants of the Data Breach on or around April 14, 2023, sending written notifications to individuals whose personal information was compromised in the Data Breach.

39.     Plaintiff's and Class Members' PII was accessed and stolen in the Data Breach.

40.     Plaintiff further believes her PII, and that of Class Members, was subsequently sold on the dark web following the Data Breach, as that is the modus operandi of cybercriminals that commit cyber-attacks of this type.

41.     Upon information and belief, the PII was not encrypted before the Data Breach.

42.     Upon information and belief, the cyberattack was targeted at YUM! as large employer that collects and maintains valuable personal and financial data from its current and former employees and applicants.

43.     Upon information and belief, the cyberattack was expressly designed to gain access to private and confidential data, including (among other things) the PII of Plaintiff and the Class Members.

44.     In response to the Data Breach, YUM! claims it has further secured its systems to protect the Private Information. YUM! admits additional security was required, but there is no indication whether these steps are adequate to protect Plaintiff's and Class Members' PII going forward.

45.     YUM! had obligations created by contract, industry standards, common law, and representations made to employees and applicants to keep the PII of Plaintiff and Class Members that was entrusted to YUM! confidential, and to protect the PII from unauthorized access and

---

[10] *Id.*

disclosure.

46.     Plaintiff and Class Members provided their PII to YUM! with the reasonable expectation that YUM! as a sophisticated company would comply with its duty and obligations and representations to keep such information confidential and secure from unauthorized access.

47.     YUM! failed to uphold its data security obligations to Plaintiff and Class Members. As a result, Plaintiff and Class Members are significantly harmed and will be at a high risk of identity theft and financial fraud for many years to come.

48.     YUM! did not use reasonable security procedures and practices appropriate to the nature of the sensitive, unencrypted information it was maintaining, causing Plaintiff's and Class Members' PII to be exposed.

### Securing PII and Preventing Breaches

49.     YUM! could have prevented this Data Breach by properly encrypting or otherwise protecting their equipment and computer files containing PII.

50.     In its notice letters, YUM! acknowledged the sensitive and confidential nature of the PII. To be sure, collection, maintaining, and protecting PII is vital to virtually all of YUM!'s business purposes. YUM! acknowledged through its conduct and statements that the misuse or inadvertent disclosure of PII can pose major privacy and financial risks to impacted individuals, and that under state law they may not disclose and must take reasonable steps to protect PII from improper release or disclosure.

### The Ransomware Attack and Data Breach were Foreseeable Risks of which Defendant was on Notice

51.     It is well known that PII, including Social Security numbers in particular, is an invaluable commodity and a frequent target of hackers.

52.     In 2019, a record 1,473 data breaches occurred, resulting in approximately 164,683,455 sensitive records being exposed, a 17% increase from 2018.[11]

53.     Individuals place a high value not only on their PII, but also on the privacy of that data. For the individual, identity theft causes "significant negative financial impact on victims" as well as severe distress and other strong emotions and physical reactions.

54.     Individuals are particularly concerned with protecting the privacy of their dates of birth and Social Security numbers, which are the "secret sauce" that is "as good as your DNA to hackers."

55.     In light of recent high profile data breaches at other industry leading companies, including, Microsoft (250 million records, December 2019), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estee Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), and Advanced Info Service (8.3 billion records, May 2020), YUM! knew or should have known that its electronic records would be targeted by cybercriminals.

56.     Indeed, cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets, so they are aware of and take appropriate measures to prepare for and are able to thwart such an attack.

57.     Despite the prevalence of public announcements of data breach and data security compromises, and despite its own acknowledgments of data security compromises, and despite their own acknowledgment of its duties to keep PII private and secure, YUM! failed to take appropriate steps to protect the PII of Plaintiff and the proposed Class from being compromised.

---

[11]     https://www.idtheftcenter.org/wp-content/uploads/2020/01/01.28.2020_ITRC_2019-End-of-Year-Data-Breach-Report_FINAL_Highres-Appendix.pdf (last accessed April 23, 2023).

*At All Relevant Times YUM! Had a Duty to Plaintiff and Class Members to Properly Secure their Private Information*

58.      At all relevant times, YUM! had a duty to Plaintiff and Class Members to properly secure their PII, encrypt and maintain such information using industry standard methods, train its employees, utilize available technology to defend its systems from invasion, act reasonably to prevent foreseeable harm to Plaintiff and Class Members, and to *promptly* notify Plaintiff and Class Members when YUM! became aware that their PII may have been compromised.

59.      YUM!'s duty to use reasonable security measures arose as a result of the special relationship that existed between YUM!, on the one hand, and Plaintiff and the Class Members, on the other hand. The special relationship arose because Plaintiff and the Members of the Class entrusted YUM! with their PII when they were employees or job applicants of YUM!.

60.      YUM! had the resources necessary to prevent the Data Breach but neglected to adequately invest in security measures, despite its obligation to protect such information. Accordingly, YUM! breached its common law, statutory, and other duties owed to Plaintiff and Class Members.

61.      Security standards commonly accepted among businesses that store PII using the internet include, without limitation:

      a.   Maintaining a secure firewall configuration;

      b.   Maintaining appropriate design, systems, and controls to limit user access to certain information as necessary;

      c.   Monitoring for suspicious or irregular traffic to servers;

      d.   Monitoring for suspicious credentials used to access servers;

      e.   Monitoring for suspicious or irregular activity by known users;

      f.   Monitoring for suspicious or unknown users;

g. Monitoring for suspicious or irregular server requests;

h. Monitoring for server requests for PII;

i. Monitoring for server requests from VPNs; and

j. Monitoring for server requests from Tor exit nodes.

62.    The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[12] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[13]

63.    The ramifications of YUM!'s failure to keep its Class Members' PII secure are long lasting and severe. Once PII is stolen, particularly a Social Security number, fraudulent use of that information and damage to victims is likely to continue for years.

### The Value of Personal Identifiable Information

64.    The PII of individuals remains of high value to criminals, as evidenced by the prices the criminals will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, Personal Information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[14] Experian reports that a stolen credit or

---

[12] 17 C.F.R. § 248.201 (2013).

[13] *Id.*

[14] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last visited April 23, 2023).

debit card number can sell for $5 to $110 on the dark web.[15] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[16]

65.      Social Security numbers, for example, are among the worst kind of PII to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[17]

66.      What is more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

67.      Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "[t]he credit bureaus and banks are able to link

---

[15] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at*: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited April 23, 2023).
[16] *In the Dark*, VPNOverview, 2019, *available at*: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited April 23, 2023).
[17] Social Security Administration, *Identity Theft and Your Social Security Number*, *available at*: https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited April 23, 2023).

the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[18]

68.    Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change—one's Social Security number.

69.    This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[19]

70.    Among other forms of fraud, identity thieves may use Social Security numbers to obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

71.    The fraudulent activity resulting from the Data Breach may not come to light for years.

72.    There may be a time lag between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

---

[18] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), *available at*: http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft (last visited April 23, 2023).
[19] Time Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, (Feb. 6, 2015), *available at*: https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited April 23, 2023).

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[20]

73.     At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiff and Class Members, including Social Security numbers, and of the foreseeable consequences that would occur if Defendant's data security system and network was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

74.     Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

75.     Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's server(s), amounting to potentially thousands of individuals' detailed PII, and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

76.     In the breach notification letter, Defendant made an offer of twenty-four (24) months of credit and identity monitoring services. This is wholly inadequate to compensate Plaintiff and Class Members as it fails to provide for the fact that victims of data breaches and other unauthorized disclosures commonly face many years of ongoing identity theft and financial fraud, and it entirely fails to provide sufficient compensation for the unauthorized release and disclosure of Plaintiff's and Class Members' PII.

---

[20]     *Report to Congressional Requesters*, GAO, at 29 (June 2007), *available at:* https://www.gao.gov/assets/gao-07-737.pdf (last visited April 23, 2023).

77.     The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the PII of Plaintiff and Class Members.

78.     The ramifications of Defendant's failure to keep secure the PII of Plaintiff and Class Members are long lasting and severe. Once PII is stolen, particularly Social Security numbers, fraudulent use of that information and damage to victims may continue for years.

### YUM! Failed to Comply with FTC Guidelines

79.     Federal and State governments have established security standards and issued recommendations to lessen the risk of data breaches and the resulting harm to consumers and financial institutions. The Federal Trade Commission ("FTC") has issued numerous guides for business highlighting the importance of reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[21]

80.     In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established guidelines for fundamental data security principles and practices for business.[22] The guidelines note businesses should protect the personal consumer and consumer information that they keep, as well as properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct security problems.

81.     The FTC recommends that businesses:

    a.    Identify all connections to the computers where you store sensitive information.

---

[21]    Federal    Trade    Commission,    *Start    With    Security,    available    at*: https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf    (last accessed April 23, 2023).

[22] Federal Trade Commission, *Protecting Personal Information: A Guide for Business, available at*: https://www.ftc.gov/tips-advice/business-center/guidance/protecting-personal-information-guide-business (last accessed April 23, 2023).

b.  Assess the vulnerability of each connection to commonly known or reasonably foreseeable attacks.

c.  Do not store sensitive consumer data on any computer with an internet connection unless it is essential for conducting their business.

d.  Scan computers on their network to identify and profile the operating system and open network services. If services are not needed, they should be disabled to prevent hacks or other potential security problems. For example, if email service or an internet connection is not necessary on a certain computer, a business should consider closing the ports to those services on that computer to prevent unauthorized access to that machine.

e.  Pay particular attention to the security of their web applications—the software used to give information to visitors to their websites and to retrieve information from them. Web applications may be particularly vulnerable to a variety of hack attacks

f.  Use a firewall to protect their computers from hacker attacks while it is connected to a network, especially the internet.

g.  Determine whether a border firewall should be installed where the business's network connects to the internet. A border firewall separates the network from the internet and may prevent an attacker from gaining access to a computer on the network where sensitive information is stored. Set access controls—settings that determine which devices and traffic get through the firewall—to allow only trusted devices with a legitimate business need to access the network. Since the

protection a firewall provides is only as effective as its access controls, they should be reviewed periodically.

h. Monitor incoming traffic for signs that someone is trying to hack in. Keep an eye out for activity from new users, multiple log-in attempts from unknown users or computers, and higher-than-average traffic at unusual times of the day.

i. Monitor outgoing traffic for signs of a data breach. Watch for unexpectedly large amounts of data being transmitted from their system to an unknown user. If large amounts of information are being transmitted from a business' network, the transmission should be investigated to make sure it is authorized.

82. The FTC has brought enforcement actions against businesses for failing to protect employee and customer data adequately and reasonably, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

83. Because Class Members entrusted YUM! with their PII directly or indirectly, YUM! had, and has, a duty to the Class Members to keep their PII secure.

84. Plaintiff and the other Class Members reasonably expected that when they provide PII to YUM!, that YUM! would safeguard their PII.

85. YUM! was at all times fully aware of its obligation to protect the personal data of impacted individuals, including Plaintiff and members of the Classes. YUM! was also aware of the significant repercussions if it failed to do so.

86. YUM!'s failure to employ reasonable and appropriate measures to protect against

unauthorized access to confidential data—including Plaintiff's and Class Members' full names, Social Security numbers, and other highly sensitive and confidential information—constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

### *Plaintiff and Class Members Have Suffered Concrete Injury as a Result of Defendant's Inadequate Security and the Data Breach it Allowed.*

87.     Plaintiff and Class Members reasonably expected that Defendant would provide adequate security protections for their PII, and Class Members provided Defendant with sensitive personal information.

88.     Defendant's poor data security deprived Plaintiff and Class Members of the benefit of their bargain. When agreeing to pay Defendant for services, Plaintiff and other reasonable Class Members understood and expected that their PII would be protected with data security, when in fact Defendant did not provide the expected data security. Accordingly, Plaintiff and Class Members received services that were of a lesser value than what they reasonably expected. As such, Plaintiff and the Class Members suffered pecuniary injury.

89.     Cybercriminals capture PII to exploit it; the Class Members are now, and for the rest of their lives will be, at a heightened risk of identity theft. Plaintiff has also incurred (and will continue to incur) damages in the form of, *inter alia*, loss of privacy and costs of engaging adequate credit monitoring and identity theft protection services.

90.     The cybercriminals who obtained the Class Members' PII may exploit the information they obtained by selling the data in so-called "dark markets." Having obtained these names, contact information, Social Security numbers, and other PII, cybercriminals can pair the data with other available information to commit a broad range of fraud in a Class Member's name, including but not limited to:

      a.   obtaining employment;

b.  obtaining a loan;

c.  applying for credit cards or spending money;

d.  filing false tax returns;

e.  stealing Social Security and other government benefits; and

f.  applying for a driver's license, birth certificate, or other public document.

91.    In addition, if a Class Member's Private Information is used to create false identification for someone who commits a crime, the Class Member may become entangled in the criminal justice system, impairing the person's ability to gain employment or obtain a loan.

92.    As a direct and/or proximate result of Defendant's wrongful actions and/or inaction and the resulting Data Breach, Plaintiff and the other Class Members have been deprived of the value of their PII, for which there is a well-established national and international market.

93.    Furthermore, PII has a long shelf-life because it contains different forms of personal information, it can be used in more ways than one, and it typically takes time for an information breach to be detected.[23]

94.    Accordingly, Defendant's wrongful actions and/or inaction and the resulting Data Breach have also placed Plaintiff and the other Class Members at an imminent, immediate, and continuing increased risk of identity theft and identity fraud. Indeed, "[t]he level of risk is growing for anyone whose information is stolen in a data breach."[24] Moreover, there is a high likelihood that significant identity fraud and/or identity theft has not yet been discovered or reported. Even data that have not yet been exploited by cybercriminals bears a high risk that the cybercriminals who now possess Class Members' PII will do so at a later date or re-sell it.

---

[23] *Id.*
[24] Susan Ladika, *Study: Data Breaches Pose A Greater Risk* (July 23, 2014), https://www.foxbusiness.com/features/study-data-breaches-pose-a-greater-risk (last accessed April 23, 2023).

95.      As a result of the Data Breach, Plaintiff and Class Members have already suffered damages.

96.      In its notice letter, Defendant represented to the Class Members and state attorney generals that it initially was made aware of Data Breach in January 2023, and admitted files were accessed and acquired by the cybercriminals. As EmiSoft, an award-winning malware-protection software company, states "[a]n absence of evidence of exfiltration should not be construed to be evidence of its absence, *especially during the preliminary stages of the investigation*."[25] It is likely that the cybercriminals did steal data and did so undetected.

97.      In this case, according to Defendant's notification to the Class Members, cybercriminals had access to Class Members' data at least on January 13, 2023, yet its notice letters about that Data Breach did not go out until April 14, 2023. This is tantamount to the cybercriminals having an extended head start on stealing the identities of Plaintiff and Class Members.

98.      Accordingly, that Defendant has admitted that the data was accessed, acquired, and stolen.

***Plaintiff Haley Beasley's Experience***

99.      Plaintiff Beasley is a former YUM! employee.

100.     Plaintiff Beasley was required to provide and did provide her PII to Defendant during the course of her employment with Defendant. The PII included her name and Social Security Number.

101.     To date, YUM! has done next to nothing to adequately protect Plaintiff and Class Members, or to compensate them for their injuries sustained in this Data Breach.

---

[25] EmiSoft Malware Lab, *The chance of data being stolen in a ransomware attack is greater than one in ten* (EMISOFT BLOG July 13, 2020), https://blog.emsisoft.com/en/36569/the-chance-of-data-being-stolen-in-a-ransomware-attack-is-greater-than-one-in-ten/ (last accessed April 23, 2023, emphasis added).

102.    Defendant's data breach notice letter downplays the theft of Plaintiff's and Class Members' PII, when the facts demonstrate that the PII was targeted, accessed, and exfiltrated in a Data Breach. The fraud and identity monitoring services offered by Defendant are only for one year, and it places the burden squarely on Plaintiff and Class Members by requiring them to expend time signing up for the service and addressing timely issues.

103.    Plaintiff and Class Members have been further damaged by the compromise of their PII.

104.    Plaintiff Beasley's PII was compromised in the Data Breach, and was likely stolen and in the hands of cybercriminals who illegally accessed YUM!' network for the specific purpose of targeting the PII.

105.    Plaintiff Beasley typically takes measures to protect her PII, and is very careful about sharing her PII. Plaintiff Beasley has never knowingly transmitted unencrypted PII over the internet or other unsecured source.

106.    Plaintiff Beasley stores any documents containing her PII in a safe and secure location, and she diligently chooses unique usernames and passwords for her online accounts.

107.    As a result of the Data Breach, Plaintiff has suffered a loss of time and has spent and continues to spend a considerable amount of time on issues related to this Data Breach. She monitors accounts and credit scores and has sustained emotional distress. This is time that was lost and unproductive and took away from other activities and duties.

108.    Plaintiff also suffered actual injury in the form of damages to and diminution in the value of her PII—a form of intangible property that she entrusted to Defendant for the purpose of obtaining employment from Defendant, which was compromised in and as a result of the Data Breach.

109.    Plaintiff suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach and has anxiety and increased concerns for the loss of her privacy. Since the Data Breach, Plaintiff has also experienced an increase in calls that can be characterized as spam or scams.

110.    Plaintiff has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from her PII, especially her Social Security Number, being placed in the hands of criminals.

111.    Defendant obtained and continues to maintain Plaintiff's PII (despite no longer having a legitimate use for it) and has a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure. Defendant required the PII from Plaintiff when she began employment with Defendant. Plaintiff, however, would not have entrusted her PII to Defendant had she known that it would fail to maintain adequate data security. Plaintiff's PII was compromised and disclosed as a result of the Data Breach.

112.    As a result of the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. As a result of the Data Breach, Plaintiff is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

113.    Plaintiff Beasley has a continuing interest in ensuring that her PII, which, upon information and belief, remains backed up in YUM!'s possession, is deleted and/or protected and safeguarded from future breaches.

## CLASS ALLEGATIONS

114.    Plaintiff brings this nationwide class action on behalf of herself and on behalf of all others similarly situated.

115.    The Nationwide Class that Plaintiff seeks to represent is defined as follows:

**All persons YUM! identified as being among those individuals impacted by the Data Breach, including all who were sent a notice of the Data Breach.**

116.    Excluded from the Classes are the following individuals and/or entities: YUM, its parents, subsidiaries, affiliates, officers and directors, and any entity in which YUM! has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

117.    Plaintiff reserves the right to modify or amend the definition of the proposed class and any future subclass before the Court determines whether certification is appropriate.

118.    Numerosity, Fed R. Civ. P. 23(a)(1): Class Members are so numerous that joinder of all members is impracticable. Upon information and belief, there are at least thousands of individuals whose Private Information may have been improperly accessed in the Data Breach, and each Class is apparently identifiable within Defendant's records.

119.    Commonality, Fed. R. Civ. P. 23(a)(2) and (b)(3): Questions of law and fact common to the Class exists and predominates over any questions affecting only individual Class Members. These include:

a.    Whether and to what extent Defendant had a duty to protect Plaintiff's and Class Members' Private Information;

b.    Whether Defendant had duties not to disclose the Plaintiff's and Class Members' Private Information to unauthorized third parties;

c.    Whether Defendant had duties not to use Plaintiff's and Class Members' Private

Information for non-business purposes;

d.   Whether Defendant failed to adequately safeguard Plaintiff's and Class Members' Private Information;

e.   Whether and when Defendant actually learned of the Data Breach;

f.   Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their Private Information had been compromised;

g.   Whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their Private Information had been compromised;

h.   Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

i.   Whether Defendant adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

j.   Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard Plaintiff's and Class Members' Private Information;

k.   Whether Defendant violated the consumer protection statutes invoked herein;

l.   Whether Plaintiff and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendant's wrongful conduct;

m.   Whether Plaintiff and Class Members are entitled to restitution as a result of Defendant's wrongful conduct; and

n.   Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

120.   Typicality, Fed. R. Civ. P. 23(a)(3): Plaintiff's claims are typical of those of other

Class Members because all had their Private Information compromised as a result of the Data Breach, due to Defendant's misfeasance.

121.    <u>Policies Generally Applicable to the Class</u>: This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

122.    <u>Adequacy</u>, Fed. R. Civ. P. 23(a)(4): Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that Plaintiff has no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages Plaintiff has suffered are typical of other Class Members. Plaintiff has also retained counsel experienced in complex class action litigation, and Plaintiff intend to prosecute this action vigorously.

123.    <u>Superiority and Manageability</u>, Fed. R. Civ. P. 23(b)(3): Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class

Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

124.    The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

125.    The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

126.    Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

127.    Unless a Class-wide injunction is issued, Defendant may continue in their failure to properly secure and unlawful disclosure of the Private Information of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Defendant may continue to act unlawfully as set forth in this Complaint.

128.     Further, Defendant has acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

129.     Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

    a.   Whether Defendant owed a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

    b.   Whether Defendant breached a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

    c.   Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

    d.   Whether a contract existed between Defendant on the one hand, and Plaintiff and Class Members on the other, and the terms of that contract;

    e.   Whether Defendant breached the contract;

    f.   Whether an implied contract existed between Defendant on the one hand, and Plaintiff and Class Members on the other, and the terms of that implied contract;

    g.   Whether Defendant breached the implied contract;

    h.   Whether Defendant adequately and accurately informed Plaintiff and Class Members that their Private Information had been compromised;

    i.   Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

    j.   Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard Plaintiff's and Class Members' Private Information;

    k.   Whether Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendant's wrongful conduct.

<u>**COUNT I**</u>
**Negligence**
**(On Behalf of Plaintiff and the Nationwide Class)**

130.    Plaintiff restates and reallege all of the foregoing paragraphs as if fully set forth herein.

131.    As a condition of being employees of YUM!, individuals are obligated to provide YUM! with certain PII, including but not limited to, their name, date of birth, address, Social Security number, state-issued identification numbers, tax identification numbers, military identification numbers, and financial account numbers.

132.    Plaintiff and Class Members entrusted their PII to YUM! on the premise and with the understanding that YUM! would safeguard their information, use their PII for legitimate business purposes only, and/or not disclose their PII to unauthorized third parties.

133.    YUM! has full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and Class Members could and would suffer if the PII were wrongfully disclosed.

134.    YUM! knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the PII involved an unreasonable risk of harm to Plaintiff and Class Members, even if the harm occurred through the criminal acts of a third party.

135.    YUM! had a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties. This duty includes, among other things, designing, maintaining, and testing YUM!'s security protocols to ensure that Plaintiff's and Class Members' information in YUM!'s possession was adequately secured and protected.

136.    YUM! also had a duty to have procedures in place to detect and prevent the improper access and misuse of Plaintiff's and Class Members' PII.

137.    A breach of security, unauthorized access, and resulting injury to Plaintiff and Class Members was reasonably foreseeable, particularly in light of YUM!'s business as sophisticated corporation, for which the diligent protection of PII is a continuous forefront issue.

138.    Plaintiff and Class Members were the foreseeable and probable victims of YUM!'s inadequate security practices and procedures. YUM! knew of should have known of the inherent risks in collecting and storing the PII of Plaintiff and the Class, the critical importance of providing adequate security of that PII, and the necessity for encrypting PII stored on YUM!'s systems.

139.    YUM!'s own conduct created a foreseeable risk of harm to Plaintiff and Class Members. YUM!'s misconduct included, but was not limited to, its failure to take the steps and opportunities to prevent the Data Breach as set forth herein. YUM!'s misconduct also included its decisions not to comply with industry standards for the safekeeping of Plaintiff's and Class Members' PII, including basic encryption techniques freely available to YUM!.

140.    Plaintiff and Class Members had no ability to protect their PII that was in, and possibly remains in, YUM!'s possession.

141.    YUM! was in a position to protect against the harm suffered by Plaintiff and Class Members as a result of the Data Breach.

142.    YUM! had and continues to have a duty to adequately and promptly disclose that the PII of Plaintiff and Class Members within YUM!'s possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiff and Class Members to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their PII by third parties.

143.    YUM! had a duty to employ proper procedures to prevent the unauthorized dissemination of the PII of Plaintiff and Class Members.

144.    YUM! has admitted that the PII of Plaintiff and Class Members was wrongfully lost and disclosed to unauthorized third persons as a result of the Data Breach.

145.    YUM!, through its actions and/or omissions, unlawfully breached its duties to Plaintiff and Class Members by failing to implement industry protocols and exercise reasonable care in protecting and safeguarding the PII of Plaintiff and Class Members during the time the PII was within YUM!'s possession or control.

146.    Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

147.    These foregoing frameworks are existing and applicable industry standards, and Defendant failed to comply with these accepted standards thereby opening the door to the cyber incident and causing the data breach.

148.    YUM! improperly and inadequately safeguarded the PII of Plaintiff and Class

Members in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

149.    YUM! failed to heed industry warnings and alerts to provide adequate safeguards to protect PII in the face of increased risk of theft.

150.    YUM!, through its actions and/or omissions, unlawfully breached its duty to Plaintiff and Class Members by failing to have appropriate procedures in place to detect and prevent dissemination of the PII.

151.    YUM!, through its actions and/or omissions, unlawfully breached its duty to adequately and timely disclose to Plaintiff and Class Members the existence and scope of the Data Breach.

152.    But for YUM!'s wrongful and negligent breach of duties owed to Plaintiff and Class Members, the PII of Plaintiff and Class Members would not have been compromised.

153.    There is a close causal connection between YUM!'s failure to implement security measures to protect the PII of Plaintiff and Class Members and the harm suffered or risk of imminent harm suffered by Plaintiff and Class. Plaintiff's and Class Members' PII was lost and accessed as the proximate result of YUM!'s failure to exercise reasonable care in safeguarding such PII by adopting, implementing, and maintaining appropriate security measures.

154.    Additionally, Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as YUM!, of failing to use reasonable measures to protect PII. The FTC publications and orders described above also form part of the basis of YUM!'s duty in this regard.

155.    YUM! violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards, as described in detail herein.

YUM!'s conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and Class Members.

156.    YUM!'s violation of Section 5 of the FTC Act constitutes negligence *per se*.

157.    Plaintiff and Class members are within the class of persons that the FTC Act was intended to protect.

158.    The harm that occurred as a result of the Data Breach is the type of harm the FTC Act was intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and Class.

159.    As a direct and proximate result of YUM!'s negligence and negligence *per se*, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity of how their PII is used; (iii) the compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from tax fraud and identity theft; (vi) costs associated with placing freezes on credit reports; (vii) the continued risk to their PII, which remain in YUM!'s possession and is subject to further unauthorized disclosures so long as YUM! fails to undertake appropriate and adequate measures to protect the PII in their continued possession; (viii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data

Breach for the remainder of the lives of Plaintiff and Class Members; and (ix) the diminished value of YUM!'s goods and services they received.

160.    As a direct and proximate result of YUM!'s negligence, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

161.    Additionally, as a direct and proximate result of YUM!'s negligence and negligence *per se*, Plaintiff and Class Members have suffered and will suffer the continued risks of exposure of their PII, which remains in YUM!'s possession and is subject to further unauthorized disclosures so long as YUM! fails to undertake appropriate and adequate measures to protect the PII in its continued possession.

## COUNT II
### Invasion of Privacy
### (On Behalf of Plaintiff and the Nationwide Class)

162.    Plaintiff re-alleges and incorporates by reference the above paragraphs as if fully set forth herein.

163.    Plaintiff and Class Members had a legitimate expectation of privacy to their PII and were entitled to the protection of this information against disclosure to unauthorized third parties.

164.    Defendant owed a duty to its current, former, and prospective employees, including Plaintiff and Class Members, to keep their PII contained as a part thereof, confidential.

165.    Defendant failed to protect and released to unknown and unauthorized third parties the PII of Plaintiff and Class Members.

166.    Defendant has acted with reckless disregard for the privacy of Plaintiff and Class Members rising to the level of (1) an intentional intrusion by Defendant, (2) into a matter that

Plaintiff and Class Members have a right to keep private (i.e., their PII), and (3) which is highly offensive to a reasonable person.

167.    Defendant acted with a knowing state of mind when it permitted the Data Breach to occur because it had actual knowledge that its information security practices were inadequate and insufficient. For example, Defendant knew that PII was stored for years after Defendant no longer had a legitimate use for such data. Defendant also knew that the PII it stored was not securely encrypted, and that its systems were vulnerable to foreseeable threats as a result of inadequate security measures and training.

168.    Moreover, upon information and belief, the Data Breach was the result of a phishing attack, which both Defendant's security software and Defendant's employees should have recognized, as this is the most common method of effectuating a data breach.[26] By revealing necessary credentials to access the system or network storing Plaintiff's and Class Members' PII in response to a phishing attack, Defendant actively disclosed Plaintiff's and Class Members' PII and invaded their privacy.

169.    As discussed in this Complaint, Defendant was aware of the potential of a data breach and failed to adequately safeguard its systems and implement appropriate policies to prevent the unauthorized release of Plaintiff's and Class Members' data.

---

[26] *See* https://en.wikipedia.org/wiki/Phishing ("As of 2020, phishing is by far the most common attack performed by cybercriminals, the FBI's Internet Crime Complaint Centre recording over twice as many incidents of phishing than any other type of computer crime.") (citing *Internet Crime Report 2020*, FBI Internet Crime Complaint Centre. U.S. Federal Bureau of Investigation. Retrieved 21 March 2021); *see also* https://www.checkpoint.com/cyber-hub/threat-prevention/what-is-phishing/ (last visited April 23, 2023) ("Phishing is the most common type of social engineering, which is a general term describing attempts to manipulate or trick computer users. Social engineering is an increasingly common threat vector used in almost all security incidents. Social engineering attacks, like phishing, are often combined with other threats, such as malware, code injection, and network attacks.").

170.    Defendant acted with such reckless disregard as to the safety of Plaintiff's and Class Members' PII to rise to the level of intentionally allowing the intrusion upon Plaintiff's and Class Members' seclusion.

171.    The unauthorized release to, custody of, and examination by unauthorized third parties of the PII of Plaintiff and the Class Members is highly offensive to a reasonable person.

172.    Plaintiff and Class Members have been damaged by the invasion of their privacy in an amount to be determined at trial.

### COUNT III
### Unjust Enrichment
### (On Behalf of Plaintiff and the Nationwide Class)

173.    Plaintiff re-alleges and incorporate by reference paragraphs above as if fully set forth herein.

174.    Defendant collected, maintained, and stored the PII of Plaintiff and Class Members and, as such, Defendant had knowledge of the benefits it received on behalf of the Plaintiff and Class Members.

175.    Defendant also understood and appreciated that Plaintiff's and Class Members' PII was private and confidential, and its value depended upon Defendant maintaining the privacy and confidentiality of that information.

176.    Plaintiff and Class Members conferred a monetary benefit upon Defendant in the form of employment or purchasing products from Defendant, and in connection thereto, by providing their PII to Defendant with the understanding that Defendant would pay for the administrative costs of reasonable data privacy and security practices and procedures. Specifically, they were required to provide Defendant with their PII. In exchange, Plaintiff and Class Members should have received adequate protection and data security for such PII held by Defendant.

177.    Defendant knew Plaintiff and Class Members conferred a benefit which Defendant accepted. Defendant profited from these transactions and used the PII of Plaintiff and Class Members for business purposes.

178.    Defendant failed to provide reasonable security, safeguards, and protections to the PII of Plaintiff and Class Members.

179.    Under the principles of equity and good conscience, Defendant should not be permitted to retain money belonging to Plaintiff and Class Members, because Defendant failed to implement appropriate data management and security measures mandated by industry standards.

180.    Defendant wrongfully accepted and retained these benefits to the detriment of Plaintiff and Class Members.

181.    Defendant's enrichment at the expense of Plaintiff and Class Members is and was unjust.

182.    As a result of Defendant's wrongful conduct, as alleged above, Plaintiff and the Class Members are entitled to restitution and disgorgement of all profits, benefits, and other compensation obtained by Defendant, plus attorneys' fees, costs, and interest thereon.

### COUNT IV
### Breach of Implied Contract
### (On Behalf of Plaintiff and the Nationwide Class)

183.    Plaintiff re-alleges and incorporates by reference the foregoing paragraphs as if fully set forth herein.

184.    This count is plead in the alternative to Count III (Unjust Enrichment) above.

185.    Plaintiff's and Class Members' PII was provided to Defendant as part of employment that Defendant provided to Plaintiff and Class Members.

186.     Plaintiff and Class Members agreed to provide Defendant PII in exchange for potential employment.

187.     Defendant and the Plaintiff and Class Members entered into implied contracts for the provision of adequate data security, separate and apart from any express contracts concerning the security of Plaintiff's and Class Members' PII, whereby, Defendant was obligated to take reasonable steps to secure and safeguard Plaintiff's and Class Members' PII.

188.     Defendant had an implied duty of good faith to ensure that the PII of Plaintiff and Class Members in its possession was only used in accordance with its contractual obligations.

189.     Defendant was therefore required to act fairly, reasonably, and in good faith in carrying out its contractual obligations to protect the confidentiality of Plaintiff's and Class Members' PII and to comply with industry standards and applicable laws and regulations for the security of this information.

190.     Under these implied contracts for data security, Defendant was further obligated to provide Plaintiff and all Class Members, with prompt and sufficient notice of any and all unauthorized access and/or theft of their PII.

191.     Defendant breached the implied contracts by failing to take adequate measures to protect the confidentiality of Plaintiff's and Class Members' PII, resulting in the Data Breach.

192.     Defendant further breached the implied contract by providing untimely notification to Plaintiff and Class Members who may already be victims of identity fraud or theft or are at present risk of becoming victims of identity theft or fraud.

193.     The Data Breach was a reasonably foreseeable consequence of Defendant's actions in breach of these contracts.

194.    As a result of Defendant's conduct, Plaintiff and Class Members did not receive the full benefit of the bargain.

195.    Had Defendant disclosed that its data security was inadequate, neither the Plaintiff or Class Members, nor any reasonable person would have entered into such contracts with Defendant.

196.    As a result of Data Breach, Plaintiff and Class Members suffered actual damages resulting from the theft of their PII, as well as the loss of control of their PII, and remain at present risk of suffering additional damages.

197.    Plaintiff and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach, including the loss of the benefit of the bargain.

198.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, *e.g.*, (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of herself and all Class Members, requests judgment against Defendant YUM! and that the Court grant the following:

A.    For an Order certifying the Nationwide Classes and appointing Plaintiff and her Counsel to represent the certified Nationwide Class;

B.    For equitable relief enjoining YUM! from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and the Class Members' PII, and from refusing to issue prompt, complete, any accurate disclosures to the

Plaintiff and Class;

C.    For injunctive relief requested by Plaintiff, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and the Class, including but not limited to an order:

    i.    prohibiting YUM! from engaging in the wrongful and unlawful acts described herein;

    ii.    requiring YUM! to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state, or local laws;

    iii.    requiring YUM! to delete, destroy, and purge the personal identifying information of Plaintiff and Class unless YUM! can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and the Class;

    iv.    requiring YUM! to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the personal identifying information of Plaintiff's and Class Members' personal identifying information;

    v.    prohibiting YUM! from maintaining Plaintiff's and Class Members' personal identifying information on a cloud-based database;

    vi.    requiring YUM! to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on YUM!'s systems on a periodic basis, and ordering YUM! to promptly correct any

problems or issues detected by such third-party security auditors;

vii.  requiring YUM! to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii.  requiring YUM! to audit, test, and train its security personnel regarding any new or modified procedures;

ix.  requiring YUM! to segment data by, among other things, creating firewalls and access controls so that if one area of YUM!'s network is compromised, hackers cannot gain access to other portions of YUM!'s systems;

x.  requiring YUM! to conduct regular database scanning and securing checks;

xi.  requiring YUM! to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiff and Class Members;

xii.  requiring YUM! to conduct internal training and education routinely and continually, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response;

xiii.  requiring YUM! to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with YUM!'s policies, programs, and systems for protecting personal identifying information;

xiv.    requiring YUM! to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor YUM!'s information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xv.    requiring YUM! to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves;

xvi.    requiring YUM! to implement logging and monitoring programs sufficient to track traffic to and from YUM!'s servers; and,

xvii.    for a period of 10 years, appointing a qualified and independent third-party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate YUM!'s compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment; and

D.    For an award of damages, including actual, nominal, and consequential damages, as allowed by law in an amount to be determined;

E.    For an award of punitive damages;

F.    For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

G.    For prejudgment interest on all amounts awarded; and

H.    Such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands that this matter be tried before a jury.

Date: April 24, 2023      Respectfully submitted,

            */s/ C. David Ewing*
            C. David Ewing (KBA 81580)
            Damon Blake Willis (KBA 88599)
            Ewing & Willis, PLLC
            P.O. Box 991549
            Louisville, KY 40269
            Telephone: (502) 585-5800
            Facsimile: (502) 585-5858
            ewingwillislaw@yahoo.com
            huntingcreek@twc.com
            damonwillislawyer@yahoo.com

            Terence R. Coates (*Pro Hac Vice* forthcoming)
            Dylan J. Gould (*Pro Hac Vice* forthcoming)
            Jonathan T. Deters (*Pro Hac Vice* forthcoming)
            **MARKOVITS, STOCK & DEMARCO, LLC**
            119 E. Court Street, Suite 530
            Cincinnati, OH 45202
            Phone: (513) 651-3700
            Fax: (513) 665-0219
            tcoates@msdlegal.com
            dgould@msdlegal.com
            jdeters@msdlegal.com

            *Attorneys for Plaintiff and the Proposed Class*